Filed 2/3/26 Open Main Street v. City of San Buenaventura CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

| | |
|---|---|
| OPEN MAIN STREET, | 2d Civ. No. B345169 |
| Plaintiff and Appellant, | (Super. Ct. No. 2024CUWM021824) |
| v. | (Ventura County) |
| CITY OF SAN BUENAVENTURA et al., | |
| Defendants and Respondents. | |

Open Main Street (OMS), an unincorporated association of property owners, appeals from a final judgment denying its petition for writ of mandate challenging an action by the City of San Buenaventura and Ventura City Council (collectively referred to as the City) which sought to close certain sections of downtown Ventura to vehicular traffic. The petition alleged the

City's action was not authorized by the Vehicle Code[1]and the Streets and Highways Code.  We affirm.

FACTS AND PROCEDURAL HISTORY

*Closure of Main Street in Response to the COVID-19 Emergency*

In May 2020, the City adopted an emergency ordinance in response to the COVID-19 pandemic and a state-wide emergency declaration implemented by Governor Gavin Newsom.  The ordinance closed parts of downtown Ventura to vehicular traffic.  Portions of Main Street (from Fir Street to Figueroa Plaza) and California Street (from Main Street to Santa Clara Street) were closed and businesses in the affected area were permitted to establish "parklets" on the streets in front of their buildings to use the public right-of-way for outdoor dining and retail sales.[2]

*Extensions of Main Street Closure and Study of Permanent Alternatives*

On several occasions between July 2020 and December 2022, during the COVID-19 pandemic emergency, the City voted to extend the Main Street closures.

In November 2021, the city manager submitted a staff report that recommended the City take action to implement a permanent closure of Main Street to vehicular traffic.

---

[1] All statutory references are to the Vehicle Code unless otherwise stated.

[2] Parklets "convert a former curbside parking space in front of a shop or restaurant to open space, filled with tables, benches or green space rather than parked cars."  (Schindler, *Making the Temporary Permanent: Public Space in a Postpandemic World* (2022) Yale Law Journal Forum, 376, 383.)

In March 2022, a City staff report recommended that the City extend the closure of Main Street through June 30, 2024, "while design guidelines and studies are developed" and also recommended approval of a "Main Street Moves scope analysis to include the full-closure model for Main Street from the 600 block to the Mission, with California Street between Main and Santa Clara streets reopened with parklets . . . ." The report included results and analysis of a survey of restaurant, retail and property owners in the affected Main Street area.

The scope options under consideration (which were covered in the survey) included four alternatives:

"Full Street closure (Pedestrian Mall): A full-time 365 day a year program closure triggers the need to create a pedestrian mall and closes the street to vehicular traffic long-term . . . .

"Open Street model with Parklets: Parklets would allow for the re-opening of Main and California streets to vehicular traffic while also allowing for outdoor business expansion into public right-of-way with the creation of parklets . . . .

"Flex Street model: The flex model is another common approach used nationwide that allows for outdoor business expansion in the public right-of-way during street closures and re-opened streets. For example, the streets could be closed to vehicular traffic for as short a period as weekends (Friday morning through Sunday night) or through the summer months but open to vehicular traffic on all the other days . . . .

"[Pre-COVID-19] original scope: Downtown streets re-open and outdoor business expansion into public right-of-way ends."

Staff reported that most businesses supported the full closure alternative; while most property owners supported the

3

"Flex Street Model; and when all responses were averaged "the pedestrian mall still leads as the majority choice."

In April 2022, via resolution, the City approved a Temporary Business Expansion Special Use Permit through June 30, 2024, keeping Main Street closed.

In December 2022, the City authorized staff to retain consultants necessary to the Main Street Moves project evaluation process, including a project manager, a California Environmental Quality Act (Pub. Res. Code, § 21000 et seq.) (CEQA) consultant, and a design firm to prepare parklet design guidelines and standards.

In May 2023, the Governor lifted the emergency COVID-19 declaration. At that time, Main Street remained closed pursuant to the City's April 2022 resolution.

In October 2023, City staff returned to the City to seek further guidance, explaining "the [post-COVID-19] era has introduced new variables that complicate the analysis for the [Main Street Moves] program." The staff report explained that it was unlikely that staff would have a long-term full closure program ready for consideration by July 1, 2024, and asked the City to weigh-in "on how to move forward, with either the continuation with the full-closure, enacting a pilot program flex-model, or re-open [Main Street] to vehicular traffic." The City unanimously approved a motion directing staff to continue the existing closure on an interim basis and to continue analysis of permanent options.

*OMS Demands Main Street Reopening and the City Approves a Resolution Closing Main Street*

On February 5, 2024, OMS, through counsel, demanded that the City reopen Main Street by February 16, 2024, and

4

alleged that the City had violated the Pedestrian Mall Law of 1960 (Sts. & Hy. Code, § 11000 et seq.) (PML) and CEQA, by closing Main Street for nearly four years. The letter warned that renewal of the special use permit set to expire at the end of June 2024 "would be a plain violation of CEQA, ensure litigation, and result in the payment of substantial costs and attorney fees to those challenging the City's actions."

On March 7, 2024, the City prepared and circulated a memorandum "Main Street Moves Updates and FAQs" which stated that "the [C]ity intends to keep the Main Street Moves project area closed to vehicle traffic."

*OMS files its Original Petition*

On March 11, 2024, OMS filed its original petition. It alleged that the City had violated the PML.

On May 21, 2024, a City council meeting was held and City staff again returned to the City, explaining that it was necessary for the City to take further action, given that the temporary closure approved in April 2022 was set to expire the following month. Based on staff's expectation that an environmental impact report (EIR) studying the long-term closure would be completed by the end of the year, staff recommended extending the closure by seven months, until January 31, 2025.

The City staff report further explained that section 21101, subdivision (a)(1) authorizes a city to close any street to vehicular traffic where it finds it is no longer needed for that purpose, and discussed the evidence that would support such a finding. This included the fact that the streets had been closed for four years, and a third-party traffic study prepared as part of the ongoing EIR process showed that "all intersections and street segments in the vicinity of the closure are operating at acceptable levels of

5

service under current conditions." The staff report also quoted *Citizens for Improved Sorrento Access, Inc. v. City of San Diego* (2004) 118 Cal.App.4th 808 (*Citizens for Improved Sorrento Access, Inc.*), which discussed how the statutory phrase "no longer needed" is interpreted and supported the City having "substantial discretionary authority to determine whether, in its policy judgment, a road continues to be necessary for traffic circulation purposes."

The City thereafter heard several hours of public comment, during which numerous members of the public, including many business and property owners, spoke on both sides of the issue.

After the close of public comment, the City debated the matter and ultimately adopted Resolution No. 2024-26 (the "May 21, 2024 Resolution"), determining that "[t]he portions of [Main Street] subject to the [Main Street Moves] closure are no longer needed for vehicular traffic, as the City has numerous suitable alternatives for arterial and local vehicular passage; and that the ongoing [Main Street Moves] closure is in the public interest." The City directed that Main Street remain closed until January 31, 2025.

*OMS's Second Amended Petition*

After the City adopted the May 21, 2024 Resolution, OMS filed a second amended petition, incorporating allegations that challenged the validity of the City's action.

OMS alleged that the City violated section 21101, subdivision (a)(1) on multiple grounds: 1) The May 21, 2024 Resolution closed Main Street to some, but not all, vehicular traffic; 2) the May 21, 2024 Resolution effected only a temporary closure of Main Street; 3) the City's creation of a pedestrian mall pursuant to section 21101, subdivision (a)(1) conflicted with the

6

provisions of the PML; and 4) the City's decision that Main Street was no longer necessary for vehicular traffic was arbitrary and capricious.

*The City Issues Clarifying Guidance on use of Main Street*

In advance of the May 21, 2024 City council meeting, OMS, through counsel, posed a number of questions about the proposal to find Main Street was no longer needed for vehicular traffic including how emergency service vehicles or maintenance vehicles would access the properties in the closed area.

Additional concerns were expressed by counsel for OMS, but instead in his capacity as president of Downtown Ventura Partners, which took the position that closing Main Street would prevent it from performing its "critical core functions" relating to maintenance in the closed area.

In July 2024, the City manager's office issued "Guidelines for Main Street Moves Vehicle Access" (Guidelines) to clarify what was permitted in the closure area. Those Guidelines covered access for emergency vehicles as well as vehicular access necessary "for cleaning, repair maintenance or comparable activities." The Guidelines also specified that "[r]outine vehicular access for the purpose of deliveries shall not be permitted," but allowed occasional deliveries "on a case-by-case basis upon a showing of good cause." Because the road was closed and physically blocked off, the Guidelines specified that any such access must be facilitated by authorized personnel trained in operating the closure access equipment/barriers.

*Trial Court Ruling*

On October 31, 2024, the trial court held a hearing on OMS's petition. In a Final Statement of Decision issued February 26, 2025, the court denied OMS's petition. In its ruling,

the court reviewed the City's conclusion that Main Street was no longer needed for vehicular traffic under a "highly deferential" standard applicable to legislative decisions, relying on *Citizens for Improved Sorrento Access, Inc.*, *supra*, 118 Cal.App.4th at page 814.

First, the trial court found that the City's May 21, 2024 Resolution was supported by substantial evidence and was not arbitrary, capricious or contrary to section 21101, subdivision (a). It also rejected OMS's contention that the closure of Main Street was an impermissible "partial" closure, distinguishing the authorities OMS relied upon to contend otherwise.

The trial court agreed with OMS that the serial closures in effect prior to the May 21, 2024 Resolution could not be justified under section 21101, subdivision (e), which provides for temporary street closures for "celebrations, parades, local special events, and other purposes." However, it found that this issue had been rendered moot by the City's action closing Main Street under section 21101, subdivision (a)(1).

Finally, the trial court rejected OMS's argument that the City's actions were in conflict with the PML, concluding it provided an alternative method by which the City could have closed Main Street, but it was not a procedure the City was required to follow.

## DISCUSSION

OMS seeks reversal on four grounds: 1) by "partially closing" Main Street to vehicular traffic, the City violated section 21101, subdivision (a)(1); 2) the closure of Main Street was arbitrary and capricious because Main Street is necessary for vehicular traffic; 3) the City must comply with the PML before closing Main Street to vehicular traffic; and 4) the City violated

8

section 21101, subdivision (a)(1) because the closure of Main Street was a "temporary" measure.

In traditional mandate (Code Civ. Proc., § 1085), the trial court determines whether the agency's decision was arbitrary, capricious, lacking in evidentiary support, contrary to public policy, unlawful, or procedurally unfair. (*Nowicki v. Contra Costa County Employees' Retirement Assn.* (2021) 67 Cal.App.5th 736, 746.) Our review applies the same standard as the trial court. (*Ibid.*) We independently review legal issues, and to the extent there are disputed questions of fact, we apply the substantial evidence standard. (*Ibid.*) We review questions of statutory construction de novo. (*Gramajo v. Joe's Pizza on Sunset, Inc.* (2024) 100 Cal.App.5th 1094, 1101 (*Gramajo*).)

In construing a statute, " 'our fundamental task is "to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute" . . . . ' "In the end, we " ' "must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences. . . .' " (*City of Orange v. San Diego Cnty. Emps. Ret. Assn.* (2002) 103 Cal.App.4th 45, 54-55 (*City of Orange*).)

Our review of the City's conclusion that Main Street was no longer needed for vehicular traffic "is highly deferential," as governed by the Code of Civil Procedure section 1085. (*Citizens for Improved Sorrento Access, Inc.*, *supra*, 118 Cal.App.4th at p. 814.)

9

*Closing Main Street Was Authorized by Section 21101,*
*Subdivision (a)(1) and The City's Decision to do so Was Supported*
*by Substantial Evidence*

*a) Plain Language of Section 21101, Subdivision (a)(1)*

OMS contends that, by allowing some vehicles to continue to access Main Street, the City undermined its finding that Main Street was no longer needed for vehicular traffic. We disagree.

The City relies on section 21101, subdivision (a)(1), which authorized the City to adopt an ordinance or resolution "[c]losing any highway to vehicular traffic when, in the opinion of the [the City] the highway is . . . [n]o longer needed for vehicular traffic." Contrary to OMS's assertions, "the plain language" of this provision does not require that a closure authorized by section 21101, subdivision (a)(1) must "prohibit all vehicular traffic with no exceptions" or prohibit all "access" to Main Street. Nor has it been so construed.

OMS contends that "[t]he 'no longer needed' element of [section] 21101, subdivision (a)(1) means that the street at issue will not be needed for any present or future use." OMS inaptly relies on *Heist v. County of Colusa* (1984) 163 Cal.App.3d 841, 848 and *Ratchford v. County of Sonoma* (1972) 22 Cal.App.3d 1056, 1077 for this contention. *Heist* involved construction of a statute relating to the abandonment of a street, not its closure under section 21101. If the City had wanted to vacate Main Street entirely, it would have been required to find that the street was "unnecessary for present or prospective public use." (Sts. & Hy. Code, § 8324, subd. (b).) Doing so would preclude any effort to use the vacated right-of-way as a pedestrian area. Similarly, the court in *Ratchford* was addressing the

10

abandonment of a public right-of-way; it did not address closure of a street under section 21101.

Because a decision to entirely vacate a public street is a more drastic action and subject to a higher standard than closing a street determined to be no longer needed for vehicular traffic, the more relevant case law, and the authority applied by the trial court, concerns section 21101, subdivision (a)(1). This statute has been interpreted as providing cities with substantial discretion to determine whether a city street continues to be necessary for traffic circulation purposes and to restrict the ongoing use of the street for other public purposes.

In *Citizens for Improved Sorrento Access, Inc.*, *supra*, 118 Cal.App.4th 808, the city of San Diego had closed a road under section 21101, subdivision (a)(1) that had already been closed for five years to facilitate nearby construction. Several years after the construction was completed, citizens filed a lawsuit seeking to compel its reopening. (*Citizens for Improved Sorrento Access, Inc.,* at p. 811.) The city prepared an EIR to study the proposed reopening which showed that at least 16,000 people would drive on the road if it were reopened. (*Id.* at 812.) The city council nonetheless restricted the road to pedestrian and bicycle, determining that "other transportation options in the area provided sufficient alternatives to make the road unnecessary for present or future vehicle traffic." (*Id.* at 812-813.)

In upholding the trial court's determination, the Court of Appeal held that appellate review of the city council's decision was "highly deferential" and that the plain language of the statute gave the city council "substantial discretion" to conclude the road was no longer needed for vehicular traffic circulation. (*Citizens for Improved Sorrento Access, Inc.*, *supra*, 118

11

Cal.App.4th at p. 816) "[I]f something is not 'needed' by the public, this condition means that it is *not required*, which is different from stating that the item is not *wanted* or *desired* by individual citizens. These definitions are consistent with the statutory language providing that it is the 'opinion' of the legislative body that determines whether a road is '[n]o longer needed for vehicular traffic.' [(§ 21101, subd. (a)(1).)] *The word opinion implies that the Legislature intended to provide the local legislative body with substantial discretionary authority to determine whether, in its policy judgment, a road continues to be necessary for traffic circulation purposes.*" (*Citizens for Improved Sorrento Access, Inc.*, *supra*, 118 Cal.App.4th at p. 816.)

Here, as in *Citizens for Improved Sorrento Access, Inc.*, the City properly exercised its discretionary authority to determine that Main Street was no longer needed for vehicular traffic. The City's finding was supported by the experience of the four-year closure of Main Street, triggered by the COVID-19 emergency, and by the results of a study showing that "all studied street segments and intersections near the [Main Street Moves] closure are operating at acceptable levels of service under the [Main Street] closure conditions."

The City also had evidence in the form of survey results showing broad public support for the closure. "[P]ast yearly surveys of the [Main Street Moves] closure have consistently shown that the public as well as impacted business owners tend to prefer the ongoing closure over re-opening the [Main Street Moves] area to vehicular traffic."

There was sufficient evidence to support the City's finding that the streets it was closing "are no longer needed for vehicular traffic, as the City has numerous suitable alternatives for arterial

12

and local vehicular passage." The trial court's finding on this point is supported by substantial evidence and not an abuse of discretion.

### *The May 21, 2024 Resolution Was Not a Prohibited "Partial" Closure of Main Street*

OMS concedes that the May 21, 2024 Resolution "on its face appears to apply to all vehicular traffic" but nonetheless contends that the City's actions effected a "partial" closure of Main Street in conflict with section 21101, subdivision (a)(1).

Starting from the premise that a street closure under section 21101 subdivision (a)(1) must "prohibit all vehicular traffic with no exceptions," OMS argues that by permitting limited access to Main Street for emergencies, maintenance and narrowly circumscribed deliveries, the City violated section 21101 subdivision (a)(1). The contention lacks merit.

There is nothing in section 21101, subdivision (a)(1) that compels such an interpretation. The provision simply states that a street can be closed to vehicular traffic if the opinion of the local authority is that the street is no longer needed for such traffic. Section 21101, subdivision (a)(1) says nothing about emergency access or access for maintenance. Moreover, the authorities cited by OMS do not support the interpretation upon which this argument depends.

In *City of Lafayette v. County of Contra Costa* (1979) 91 Cal.App.3d 749 (*City of Lafayette*), a city sought to close a street to "through traffic," while allowing local drivers to continue to use the street. (*Id.* at 752.) "The partial closure was to be accomplished by installation of a ' "traffic diverter" ' or automatic gate across the [road] at a point within the [city] limits. Exempted drivers were to be furnished devices to open the gate."

13

(*Id.* at 752.)  The *City of Lafayette* court held that section 21101, subdivision (a)(1) did not authorize that type of "partial closure," explaining the city had no authority to close a street "to the state's citizens generally but not . . . to its own residents."  (*Id.* at 757.)  Thus, the holding of *City of Lafayette* is limited: section 21101, subdivision (a)(1) does not allow a municipality to close a public street to certain members of the public, while allowing unfettered access to others.

In *Rumford v. City of Berkeley* (1982) 31 Cal.3d 545 (*Rumford*), the City of Berkeley erected traffic barriers designed to shift traffic from more than 40 " 'local' streets to those designated as 'arterial' ", as part of a "traffic management plan." (*Id.* at pp. 548-549.)  The barriers "did not close any street," but rather blocked "through-travel," while leaving such streets accessible to local traffic.  (*Id.* at p. 551.)  Notably, the city itself neither claimed to have closed such streets pursuant to section 21101, subdivision (a)(1) nor attempted to justify maintaining the barriers based on such provision.  (*Id.* at p. 551.)  Rather, the argument was raised by other parties that intervened in the action.  (*Ibid.*)  The court in *Rumford* held that the partial closure effected by the city of Berkeley, which allowed "unimpeded travel to drivers on each side of the barrier" and was only "closed to some vehicular traffic" was inconsistent with section 21101, subdivision (a)(1).  The opinion in *Rumford* cannot be construed as precluding the action the City took here.

Finally, *Save the Sunset Strip Coalition v. City of West Hollywood* (2001) 87 Cal.App.4th 1172, 1179 (*Save the Sunset Strip Coalition*) involved a challenge to a city's decision to create a cul-de-sac by erecting a barrier, as authorized under certain conditions by section 21101, subdivision (g) (formerly § 21101,

14

subd. (f)).  In rejecting an argument that the city was required to comply with section 21101, subdivision (a)(1) to create the cul-de-sac, the court cited *Rumford* and *City of Lafayette* for the proposition that section 21101, subdivision (a)(1) grants authority only for a "complete closure," and was thus inapplicable.  (*Save the Sunset Strip Coalition, supra*, 87 Cal.App.4th at pp. 1179-80 ["It is undisputed the present case involves the creation of a cul-de-sac . . . .  The street remains open to vehicular traffic and no residence or business . . . . is directly or indirectly inaccessible"].)  Thus, *Save the Sunset Strip Coalition* did not involve a closure undertaken pursuant to section 21101, subdivision (a)(1) and does not provide any relevant guidance on the interpretation of this provision in this case.

In closing Main Street, the City did not rely on section 21101, subdivision (a)(1) to regulate traffic in any manner similar to what was proscribed the cases OMS has relied upon.  Rather it acted to transform streets that had already been closed for four years into a pedestrian street, consistent with the original purpose of section 21101.  (See *Rumford, supra*, 31 Cal.3d at p. 552 [noting that the original version of § 21101 was adopted in 1931 to authorize municipal action such as that taken by Los Angeles when it closed city streets to create the Olvera Street market in 1929].)

Although the cases OMS has relied upon are distinguishable, we must still consider whether the City overstepped by closing Main Street, while continuing to allow limited access for emergency, maintenance and certain delivery vehicles.

A closure under section 21101, subdivision (a)(1) bars "vehicular traffic."  It does not bar any and all vehicular "access."

15

The statute does not define "vehicular access, but section 620 provides that "traffic includes pedestrians, ridden animals, vehicles, street cars, and other conveyances, either singly or together, while using any highway for *purposes of travel*." (Italics added.) In the absence of a specific "statutory definition" of a word or phrase we may look to " ' "plain meaning . . . as understood by the ordinary person, which would typically be a dictionary definition." ' " (*People v. Walker* (2024) 16 Cal.5th 1024, 1035.) Dictionary definitions of vehicular "traffic" support an interpretation that is narrower than vehicular "access." "Traffic," as a noun is defined as "the vehicles, pedestrians, ships, or planes moving along a route" (Merriam-Webster Dict. Online (2026) <http://www.merriam-webster.com/dictionary/traffic> [as of January 19, 2026].) "Traffic" as a transitive verb is defined as "to travel over." (*Ibid*.) Such meanings support an interpretation that would not bar an emergency, maintenance or delivery vehicle from having access to the closed portion of Main Street.

Although helpful, the plain meaning of "vehicular traffic" as something distinct from "vehicular access" is not dispositive in this case. " '[T]he interpretation of a statute . . . should not end . . . with a dictionary definition of a single word used therein.' [Citation.]" (*Skidgel v. California Unemployment Ins. Appeals. Bd.* (2021) 12 Cal.5th 1, 20). Rather, "to interpret a statute, we consider *all* of its language 'in context' and with reference to 'provisions relating to the same subject' and 'the whole system of law of which [the statute] is a part.' [Citation.]" (*Ibid*.)

*a) Emergency and Maintenance Vehicles*

If a firetruck enters the closed portion of Main Street to fight a fire, or an ambulance accesses the area so paramedics can treat a heart attack victim, they are not using the street for

16

purposes of travel or to move along a route but are using the street to gain access necessary to perform essential public services in a public place. Similarly, if a maintenance vehicle comes on to a closed street to repair a dangerous stretch of pedestrian roadway or sidewalk or to repair a streetlight needed to keep nighttime visitors safe, it is not using the street for purposes of travel. In none of these circumstances is the action of accessing the closed roadway fairly regarded as "vehicular traffic." For these reasons we cannot conclude that the plain meaning of the statute mandates that all emergency and maintenance vehicles must be kept entirely out of Main Street as OMS urges.

Given that the statutory text does not unambiguously require that the City bar all emergency and maintenance vehicles from having access to Main Street after it is closed, to resolve OMS's challenge, " ' "we may resort to extrinsic sources, including the ostensible objects to be achieved and the legislative history" ' " with the goal of selecting " ' " 'the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences.' " ' " (*City of Orange, supra*, 103 Cal.App.4th at pp. 54-55, citations omitted.)

As the City and the amicus, the League of California Cities (amicus), have emphasized, there is nothing unusual about treating maintenance or emergency vehicles differently from other vehicles for purposes of traffic regulation. (See, e.g., § 21053 [public employees working on highway generally exempt from Vehicle Code]; § 21055 [emergency vehicles exempt from many provisions of Vehicle Code].) Indeed, city vehicles

17

commonly access public property other than streets (parks, beaches, etc.) for similar purposes. Moreover, state law contemplates that cities will provide for ongoing maintenance of closed streets. (Sts. & Hy. Code, § 1920.)

In light of these provisions, we are loathe to read section 21101 so narrowly that it would effectively require cities to conduct maintenance on closed streets with shovels, picks and wheelbarrows manually transported onto the job site or to require emergency personnel to travel by foot into the closed portion of Main Street to perform their potentially life or property saving functions.

It is also important to consider section 21101, subdivision (a)(1) in context. Many of the surrounding provisions evidence a strong legislative intent to empower cities to close or regulate streets in a manner that promotes public safety. (See § 21101, subds. (a)(2), (e), (f) & (g).) It would be fundamentally inconsistent with that intent to construe section 21101 subdivision (a)(1) in the manner OMS urges by precluding a city from permitting emergency or maintenance access to a closed street.

Finally, if a city had to preclude itself from permitting any vehicular access to a closed road for emergencies or for maintenance it would create a strong disincentive for utilizing the option created by section 21101 to allow city to maintain a closed road as public property. Cities are often sued for injuries attributed to a dangerous condition of public property. Public entities have heightened duties concerning defects in places where pedestrians walk. (*Martinez v. City of Beverly Hills* (2021) 71 Cal.App.5th 508, 523-524.) The increased liability risks cities would face if they had to bar emergency and maintenance

18

vehicles entirely from streets closed pursuant to section 21101, subdivision (a)(1), that were still being used by pedestrians, weighs strongly against OMS's construction of the statute.

*b) Exception for Non-routine Deliveries*

Still, we must also consider whether the narrow exception the City created permitting certain non-routine deliveries to businesses fronting on Main Street invalidates the City's action under section 21101, subdivision (a)(1). We conclude that it does not.

The relevant text of the Guideline states:

"Routine vehicular access for the purpose of deliveries shall not be permitted, however, deliveries of goods and materials necessary to a [Main Street] fronting business may be authorized by the City on a case-by-case basis upon a showing of 'good cause'. 'Good cause' factors include, but are not limited to, delivery vehicle size and weight limitations, delivery open access path limitations, building/business open access point limitations, and delivery material open access point limitations. 'Good cause' shall mean that, based on the factors described in the preceding sentence, or other similar factors, there is no reasonably practicable alternative means of achieving the goal contemplated by the proposed delivery. The requesting party shall make a written request to the City [manager's office], or authorized designee, explaining its 'good cause' justification within a reasonable time prior to the proposed delivery date. In the event obtaining written permission is impracticable due to, e.g., short notice, the requesting party may obtain permission by phone; so long as the authorizing party maintains contemporaneous written records of such communications, which records shall be made available to the City upon request."

19

The record does not contain any indication that this strict protocol has been used to permit anything that might come close to constituting "vehicular traffic" under section 21101, subdivision (a)(1).  Nor is there any indication that the extent of deliveries permitted under the guidance, which post-dates the May 21, 2024 Resolution, was to any meaningful degree greater than what was permitted under the temporary closures in effect for the prior four years, when even OMS concedes Main Street was effectively closed.

We agree with the trial court, that the City's action in creating this narrow, common-sense exception to the closure of Main Street, does not undermine the validity of the May 21, 2024 Resolution.

### *Main Street Closure Did Not Conflict With The PML*

OMS contends that the City could not use section 21101 to close Main Street without compliance with the PML.

OMS describes the PML as a statute enacted for the "specific purpose" of authorizing a local entity to close a street to vehicular access (partially or completely) to create a pedestrian mall; and in contrast, asserts that section 21101 subdivision (a) is a "blunt instrument that merely allows for a public street to be closed to all vehicular traffic without exception."  Based on this characterization of the two statutes, OMS contends that the PML must control because of the principle of statutory interpretation that a "specific statute will control over the general."  (Citing *Gramajo*, *supra*, 100 Cal.App.5th at p. 1103.)  We do not agree.

Courts must, "where reasonably possible, harmonize statutes, reconcile seeming inconsistencies in them, and construe them to give force and effect to all of their provisions.  [Citation]." (*State Dept. of Public Health v. Superior Court* (2015) 60 Cal.4th

20

940, 955.) When "two codes are to be construed, they must be regarded as blending into each other and forming a single statute. Courts will " ' " . . . assume that in enacting a statute the Legislature was aware of existing, related laws and intended to maintain a consistent body of statutes. . . ." ' " (*Gramajo, supra,* 100 Cal.App.5th at p. 1101.) "Where possible, the goal of the courts is to achieve harmony between conflicting laws [citation], and avoid an interpretation which would require that one statute be ignored." (*Schmidt v. Southern Cal. Rapid Transit Dist.* (1993) 14 Cal.App.4th 23, 27.)

As the trial court found, section 21101, subdivision (a)(1) and the PML provide alternative methods to close streets to vehicles while preserving the streets as public property and providing for their use by pedestrians.

The PML expressly states that the authority it grants "to prohibit, in whole or in part, vehicular traffic on any city street shall be in addition to and not limited by the powers granted by Section 21101 of the Vehicle Code or by any other law." (Sts. & Hy. Code, § 11102.) This evidences a legislative intent that section 21101 would remain a viable method of closing a street. The PML also states that it "does not affect any other law relating to the same or similar subject, but provides an alternative procedure for the subject to which it relates." (Sts. & Hy. Code, § 11103.) Courts have interpreted similar language in other statutes to mean just what it says — the two statutes are alternate methods to achieve the same end. (*Citizens for Responsible Equitable Environmental Development v. City of San Diego* (2010) 184 Cal.App.4th 1032,1047-1048) Such a conclusion is particularly appropriate here because the original version of section 21101 subdivision (a)(1) was enacted to address what was

21

essentially the transformation of Olvera Street in downtown Los Angeles into a pedestrian mall.  (*Rumford*, *supra*, 31 Cal.3d at p. 552.)

Section 11103 also provides that "[w]hen proceedings are taken under this part, its provisions only shall apply," which OMS contends makes PML the exclusive procedure available to the City in this case.  This contention lacks merit.  Prior to the May 21, 2024 Resolution, the City did not commence any proceedings under the PML.  The PML specifies that a resolution of intention to establish a pedestrian mall must contain specific elements.  (Sts & Hy. Code, § 11200.)  There is nothing in the record establishing that such a resolution was adopted prior to the closure of Main Street under section 21101, subdivision (a)(1) and thus no basis to find that the City had commenced PML proceedings.

OMS's contention that prior to the PML "cities lacked the power to establish a pedestrian mall" (Appellant's Supplemental Request for Judicial Notice at 10) lacks merit.  Although we grant OMS's request to take judicial notice of the portions of the legislative history of the PML, that history does not support the argument.  The referenced material, a memorandum to the Governor from the Legislative Secretary recommending the bill be signed, simply indicates that "a large number of cities . . . are anxious to begin mall development."  Apart from the fact that such interest may have had more to do with provisions in the PML related to financing than to any perception that there was no preexisting legal means to create a pedestrian mall, communications within the executive branch are generally not indicative of legislative intent as " 'it is not reasonable to infer' "

22

that such materials " '. . . were ever read by the Legislature.' " (*People v. Patterson* (1990) 72 Cal.App.4th 438, 444.)

In addition to the language of the PML, which disclaims any intent to create an exclusive procedure for establishing pedestrian zones on closed streets, the operative provisions of the two statues support our conclusion they can be harmonized and thus validate the City's use of section 21101, subdivision (a)(1) to close Main Street. The PML has many detailed procedural steps that a local entity must follow to create a pedestrian mall on a fully (or partially) closed street that are not present in section 21101. It also provides mechanisms for funding improvements in the planned pedestrian mall. However, the necessary finding that is the predicate for any resolution of intent to establish a pedestrian mall under the PML is that "the public interest and convenience require the establishment of a pedestrian mall and that vehicular traffic *will not be unduly inconvenienced thereby*." (Sts. & Hy. Code, § 11200, italics added). In contrast, in order to close a street to create a pedestrian mall under section 21101, subdivision (a)(1), a more stringent standard must be met — a finding that the street to be closed is "no longer needed for vehicular traffic."

Thus, the PML expanded the circumstances in which a pedestrian mall could be established by permitting the closure of streets when doing so would not "unduly inconvenience" vehicular traffic. But it did not eliminate the alternative method that had been in effect since 1931 (when the prior version of § 21101, subd. (a)(1) was added to the code). Under that earlier method, a local legislative body could create a pedestrian mall if it met the stricter standard of finding the street is "no longer needed for vehicular traffic." (§ 21101, subd. (a)(1).)

23

The fact that these two statutory schemes are alternatives also explains why it was proper for the City to pursue the PML process for a period of time and ultimately determine that it would effectuate a closure of Main Street under section 21101, subdivision (a)(1) and not through the PML process. The City first began to evaluate using the PML to close Main Street in November 2021 and there is no indication in the record at that time the City considered the possibility of finding Main Street was no longer needed for vehicular traffic. In fact, the record indicates the opposite — that the PML was introduced as an alternative method that did not require such a finding. More than two years later, without having adopted a resolution of intent to act under the PML, the City did make a finding that Main Street was no longer needed for vehicular traffic. This finding was based in part on a record that included continuing public support for what had become a four-year closure of the street. This was a proper invocation of the authority granted in section 21101, subdivision (a)(1).

Once Main Street was closed, there was no impediment to the City creating a pedestrian zone under its general police power. Amicus cites to *Save our Heritage Organization v. City of San Diego* (2015) 237 Cal.App.4th 163 at pages 186-187 for the contention that "[t]he creation of pedestrian zones is an exercise of cities' police power to regulate public spaces for the public benefit, enhancing economic vitality, improving urban aesthetics, and promoting public safety." Accordingly, we agree with amicus, and we further agree with the trial court that the City was not required to act pursuant to the PML.

24

*The Contention that the May 21, 2024 Resolution was an Invalid "Temporary" Closure Was Rendered Moot*

OMS argues that the May 21, 2024 Resolution was not authorized by Section 21101(a)(1) because it only provided for closure of Main Street through January 31, 2025.

The City contends that: 1) there is nothing in section 21101 that requires a closure to be permanent; 2) there was good reason for the City to specify that the closure would extend until January 31, 2025; 3) the power of a city to close a road does not foreclose its power to reopen it, which implies a power to effectuate a closure for a specified time; and 4) the issue is moot because the City subsequently extended the closure of Main Street "indefinitely."

We agree with the City's mootness argument so have no reason to address its other contentions on this point. "An appellate court will not review questions that are moot and only of academic importance, nor will it determine abstract questions of law at the request of a party who shows no substantial rights can be affected by the decision either way." (*TG Oceanside, L.P. v. City of Oceanside* (2007) 156 Cal.App.4th 1355, 1385; see also, *Association of Irritated Residents v. Department of Conservation* (2017) 11 Cal.App.5th 1202, 1222 [" 'A case is considered moot when "the question addressed was at one time a live issue in the case," but has been deprived of life "because of events occurring after the judicial process was initiated" ' "].) The question of whether a street closure under section 21101 can be for a specified period of time is of academic importance only.

On January 28, 2025, the City imposed another resolution stating that Main Street "shall remain closed to vehicular traffic until and unless the [City] declares such closure is no longer in

the interests of the City." This effectively removed the end date for the closure established by the May 21, 2024 Resolution. For this reason, we decline to address OMS's contention that this specific aspect of the May 21, 2024 Resolution was inconsistent with section 21101.

<em><u>Remaining Issues</u></em>

OMS contends that the series of resolutions closing Main Street during the COVID-19 pandemic state of emergency were not proper "temporary" closures under section 21101, subdivision (e), because that section only authorizes closures "that are limited in duration to several days or weeks."

The trial court agreed with OMS's interpretation of the statute and found that these interim closures were not authorized, but concluded the issue was mooted by the City's May 21, 2024 Resolution, finding that Main Street was no longer needed for vehicular traffic and closing it on that basis. We agree that this particular challenge to the City's actions predating May 21, 2024 was "rendered moot by subsequent lawful actions of [the City]."

OMS also contends that the City's action in closing Main Street under section 21101, subdivision (a)(1) can be attacked in light of its later action attempting to pursue the creation of a pedestrian mall on Main Street under the PML.

For the first time on appeal, OMS provides evidence outside of the administrative record to support its claim. We decline to take judicial notice of these materials.

Our review is generally focused on determining if the agency's decision is an abuse of discretion or arbitrary and capricious, which makes evidence outside the record before the agency inadmissible. (*Western States Petroleum Assn. v. Superior*

26

*Court* (1995) 9 Cal.4th 559, 564-565.) Indeed, " '[a]n unbroken line of cases holds that, in traditional mandamus actions challenging quasi-legislative administrative decisions, evidence outside the administrative record (extra-record evidence) is not admissible. . . .' " (*San Joaquin County Local Agency Formation Commission v. Superior Court* (2008) 162 Cal.App.4th 159, 167.) Adherence to this rule is particularly appropriate here because much of the extra-record evidence OMS seeks to have us consider did not exist when the trial court issued its ruling.

DISPOSITION

The judgment is affirmed. Costs are awarded to respondents, the City.

NOT TO BE PUBLISHED.

KELLEY, J.*

We concur:

YEGAN, Acting P. J.

BALTODANO, J.

---

* Judge of the San Luis Obispo Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

27

Matthew P. Guasco, Judge

Superior Court County of Ventura

_____

Pachowicz Goldenring, Peter A. Goldenring; Lowthorp Richards, Darin Marx for Plaintiff and Appellant.

Javan N. Rad, City Attorney, Miles P. Hogan and Christopher De La Vega, Assistant City Attorneys; Rutan & Tucker, Peter J. Howell for Defendant and Respondent.

Colantuono, Highsmith & Whatley, Michael G. Colantuono and Stephanie L. Cooke for League of California Cities as Amicus Curiae on behalf of Defendant and Respondent.